**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>ROBERT MATEER, JR.<br><br>    Debtor<br>_____<br><br>ROBERT MATEER, JR.<br><br>    Plaintiff<br><br>v.<br><br>DAVID W. OSTRANDER and ROBERT MATEER, SR.<br><br>    Defendants | Chapter 7<br>Case No. 12-42718-MSH<br><br><br><br><br><br><br>Adversary Proceeding<br>No. 13-4045 |

**MEMORANDUM OF DECISION**

The following constitutes my findings of fact and conclusions of law after trial in this adversary proceeding in accordance with Fed. R. Bankr. P. 7052.

Robert A. Mateer, Jr., filed a voluntary chapter 13 petition commencing the main case on July 25, 2012. In schedule A (real property) of the schedules of assets and liabilities filed by Mr. Mateer in support of his petition, he identified as his only real property asset his residence in Douglas, Massachusetts. He listed its then current value as $499,712 and the amount of any claims secured by that asset as $380,425. The secured claim referred to on schedule A is identified by Mr. Mateer on schedule D (secured creditors) as his home mortgage obligation to PNC Bank.[1] In

---

[1] Based on a proof of claim filed by PNC its actual secured claim on the petition date was

1

schedule C (property claimed as exempt) Mr. Mateer claimed an exemption in his home pursuant to Mass. Gen. Laws ch. 188, § 1 (the state homestead exemption) in the amount of $119,287, the difference between the schedule A value and the PNC mortgage debt.

Mr. Mateer did not disclose anywhere in his bankruptcy schedules or in the statement of financial affairs ("SOFA") also filed in support of his petition that on January 20, 2011, his home had been severely damaged by a storm. In fairness, neither the schedules nor the SOFA calls for such a disclosure explicitly. SOFA item 8 requires disclosure of casualty losses but only within one year prior to bankruptcy. Mr. Mateer apparently took the form literally and since the storm damage occurred in January 2011, answered "none." At the same time, however, Mr. Mateer did not reflect the storm damage in the value he ascribed to his home on schedule A, instead listing its full value in an undamaged state.

Mr. Mateer also did not disclose in his bankruptcy papers that on the date of his bankruptcy petition he held outstanding insurance coverage claims for the storm damage against his insurer, Chubb Group, and against his mortgage lender, PNC Bank. As to the latter, on his bankruptcy petition date PNC as a loss payee on Mr. Mateer's homeowner's insurance policy was holding $115,813.69 in insurance proceeds paid by Chubb, which funds Mr. Mateer was actively attempting to recover. These claims should have been listed somewhere on Mr. Mateer's schedule B (personal property), such as under item 18 (other liquidated debts), item 21 (other contingent and unliquidated claims of every nature) or item 35 (other personal property not already listed).

On August 31, 2012, Mr. Mateer attended the meeting of creditors pursuant to Bankruptcy Code § 341 in his chapter 13 case. He was placed under oath and examined by the chapter 13

---

$366,677.84. Mr. Mateer amended his schedule D, presumably to reflect this amount, although he misstated it as $366,667.84.

trustee about his assets and liabilities. The trustee asked Mr. Mateer to verify that he had reviewed his bankruptcy petition, schedules and SOFA before he signed them, which Mr. Mateer confirmed. She then asked Mr. Mateer if he wished to make any changes to those documents and he said he did not. Mr. Mateer did not tell the chapter 13 trustee about the storm damage to his home, his claims against Chubb or the money PNC was holding to which he laid claim.

In December, 2012, Mr. Mateer was finally successful in extracting the $115,813.69 from PNC. A few months later he received $10,248.90 from Chubb. Thus, subsequent to the filing of his bankruptcy petition, Mr. Mateer was able to convert his pre-petition claims against Chubb and PNC into cash totaling $126,062.59.

Mr. Mateer's chapter 13 case was converted to chapter 7 on April 10, 2013. In the course of his due diligence, David Ostrander, the chapter 7 trustee appointed in the case, reviewed Mr. Mateer's bank statements and noticed some fairly sizable deposits. It was in response to Mr. Ostrander's inquiries about those deposits that Mr. Mateer finally disclosed the facts surrounding the storm damage to his home and his insurance claims and recoveries. This prompted Mr. Ostrander to file a motion to compel Mr. Mateer to turn over to him the funds he had received from PNC, which in turn caused Mr. Mateer to initiate this adversary proceeding seeking a declaratory judgment that the money he received from PNC and Chubb was exempt property under Bankruptcy Code § 522. Mr. Ostrander's turnover motion was consolidated with this adversary proceeding.

On July 19, 2013, after the trustee had filed his turnover motion in the main case and after Mr. Mateer had commenced this adversary proceeding, Mr. Mateer filed a motion to amend schedule B (personal property) to add in item 18 (other liquidated debts) $1,062.59, which he

3

described as "insurance proceeds over and above $125,000 afforded under Mass. Gen. Laws ch. 188," and which in his motion he indicated he would be forwarding to Mr. Ostrander. On July 24, 2013, Mr. Mateer filed a motion to amend schedule A (real property) to reduce the value he ascribed to his home as of the petition date from $499,712 to $373,649.41, and adding the description that this value reflected the "substantive [sic] damage to the real estate at the time of the filing estimated at $126,062.59." On July 31, 2013, he withdrew his motion to amend schedule A. Action on Mr. Mateer's motion to amend schedule B has been held in abeyance pending the conclusion of this adversary proceeding.

Mr. Mateer asserts that the value he listed for his home on the original schedule A was in reality a composite of its reduced value due to the storm damage plus the outstanding insurance claim. In other words, the scheduled value of the home undamaged, $499,712, was equal to the sum of the value of the storm-damaged home plus the insurance claim. Springboarding from this platform, Mr. Mateer insists that his homestead exemption claim on schedule C is entirely adequate to exempt both the asset he listed on schedule A, namely the damaged home, as well as the undisclosed insurance proceeds. In support he points out that the Massachusetts homestead exemption statute, Mass. Gen. Laws ch. 188, § 1, in relevant part defines the term "home" for purposes of the exemption as:

> the aggregate of: (1) any of the following: (i) a single-family dwelling, including accessory structures appurtenant thereto and the land on which it is located . . . and (3) the proceeds of any policy of insurance insuring the home against fire or other casualty loss as provided in clause (2) of said subsection (a) of said section 11.

Section 11(a) provides in relevant part:

> If a home that is subject to an estate of homestead is sold, whether voluntarily or involuntarily, taken or damaged by fire or other casualty, then the proceeds

4

> received on account of any such sale, taking or damage shall be entitled to the protection of this chapter during the following periods:
>
> . . .
>
> (2) in the event of a fire or other casualty, for a period ending on: (i) the date upon which the reconstruction or repair to the home is completed or the date on which the person benefited by the homestead acquires another home the person intends to occupy as a principal residence; or (ii) 2 years after the date of the fire or other casualty, whichever first occurs.[2]

I conducted a trial of this matter on August 26, 2014. The parties devoted most of their attention and evidence to trying to establish what Mr. Mateer's home was worth on July 25, 2012, the date of his bankruptcy filing. Mr. Mateer introduced valuation testimony to prove it was worth $400,000. This more or less dovetailed with his explanation that the value he listed in schedule A, $499,712, was a combination of the home value plus the insurance proceeds and thus supported his position that he had properly exempted both the home and the insurance money. Mr. Ostrander, on the other hand, introduced evidence that the home would have a listing price on the bankruptcy petition date of between $489,000 and $499,000 and sell for between $450,000 and $475,000.

Mr. Ostrander acknowledges that any equity in Mr. Mateer's home, that is, its value on the petition date less the mortgage balance of $366,677.84[3] was properly exempted by Mr. Mateer on

---

[2] Mass. Gen. Laws ch. 188, § 11(a) has been described as providing a "vanishing exemption," that is, one that has a self-executing temporal limitation. *See In re Williams*, 515 B.R. 395 (Bankr. D. Mass. 2014). With respect to insurance proceeds that temporal limitation is the earlier to occur of the reconstruction of the home and two years from the date of loss. Because Mr. Ostrander has not raised the potential effect of the vanishing exemption on Mr. Mateer's homestead claim, I need not address it here.

[3] On June 24, 2013, Mr. Mateer and PNC filed a joint motion for authority to enter into a loan modification agreement. The agreement increased the outstanding principal balance of the PNC loan to $400,285.22 as of June 1, 2013. On September 16, 2013, PNC filed an amended proof of claim reflecting that it was owed $400,285.22 "as of the petition date." I take judicial notice that the amount actually owed PNC on the petition date was $366,677.87, the amount set forth in PNC's original proof of claim. Based on the loan modification agreement as well as the parties' joint motion, the $400,285.22 figure was calculated as of a later date, June 1, 2013.

5

schedule C by virtue of Mr. Mateer's electing the state exemption. He notes, however, and Mr. Mateer concedes, that the maximum exemption amount available to Mr. Mateer under the state homestead statute is the so-called "automatic" homestead under Mass. Gen. Laws ch. 188. §4, which may not exceed $125,000.[4] While Mr. Ostrander strenuously objects to Mr. Mateer's being allowed to exempt any of the insurance proceeds due to his concealment which Mr. Ostrander characterizes as bad faith, he notes that even by Mr. Mateer's logic, the most he could exempt from the insurance proceeds would be the difference between his home equity and $125,000. Based on Mr. Mateer's valuation of his home at $400,000, his equity on the petition date would be $33,322.16, which would reduce the availability of a $125,000 homestead exemption to $91,677.84. This would be the maximum available to exempt the insurance proceeds of $126,062.59, meaning $34,384.75 of the insurance proceeds would be non-exempt.

    Mr. Mateer's testimony at trial was devoted mostly to answering questions about the storm damage, the repairs made or not made to his home and his efforts to recover payment from Chubb and PNC. When asked by Mr. Ostrander why he had not disclosed to the chapter 13 trustee the existence of his claims against Chubb and PNC or the storm damage to his home, Mr. Mateer's response was that she never asked. When questioned about why he hadn't listed these items on his bankruptcy schedules, Mr. Mateer testified to the effect that after consulting with his attorney he believed that they had been disclosed because the "online documents," which I take to mean the electronically filed schedules, aggregated the insurance proceeds into the reduced value of his

---

[4] The Massachusetts homestead statute provides for two different types of homesteads: a declared homestead that is "created by a written declaration, executed and recorded pursuant to section 5 [of chapter 188]" and an automatic homestead that applies in the absence of a recorded declaration of homestead. Mass. Gen Laws ch. 188, § 1. The declared homestead protects equity of up $500,000 while the automatic homestead limits its protection to $125,000. *Id.*

home and presented a home value which combined both these components into a single entry.

I find Mr. Mateer's testimony on these points unsatisfactory and lacking credibility. A failure to disclose cannot be excused by the fact that a trustee lacks clairvoyance and so does not ask about the undisclosed matter. Also, no reasonable person looking at Mr. Mateer's bankruptcy schedules could possibly have interpreted the entries valuing his home at $499,712 to represent a composite of a value-reduced storm damaged property plus insurance proceeds to replace that lost value.

Based on the evidence presented at trial, I find that Mr. Mateer intentionally failed to disclose to the court, the trustees and his creditors the existence of his insurance claim and the cash payments he received from PNC and Chubb. Mr. Mateer's excuse for his lack of disclosure is that the Massachusetts homestead statute includes insurance proceeds in its definition of "home" and so wherever Mr. Mateer identified his home on the his bankruptcy schedules he intended both the physical property and the insurance proceeds. Mr. Mateer's justification rings hollow and cannot excuse his conduct. A debtor's obligation to list his assets ─ real property on schedule A and personal property on schedule B ─ has nothing whatsoever to do with his right to exempt any of those assets. The definition of "home" under the Massachusetts homestead statute has no bearing on a debtor's obligation on schedule A to disclose the current value of the debtor's interest in real property. Mr. Mateer falsely listed his home on schedule A as having a value on the date of his bankruptcy petition of $499,712. His attempt to amend his schedules in July 2013 to disclose the insurance proceeds and reduce the value of his home commensurately provides no mitigation for his failure to disclose initially as these efforts occurred only after Mr. Ostrander had filed his motion to compel turnover of the insurance proceeds. Nor does the homestead statute give license

7

to a debtor to omit from schedule B an outstanding money claim against third parties. The fact that the money or the home may be exempt is beside the point.

A principled and honest effort by Mr. Mateer to invoke the Massachusetts homestead statute's expansive definition of home would have entailed his filing a schedule A which reflected the value of his home *reduced* by the storm damage, the inclusion of the insurance claims as an asset on schedule B and the listing of the two amounts on schedule C as a consolidated exemption claim in the home and insurance proceeds. This would have put everyone on notice of the true state of his financial affairs as of the petition date.

Up until March 4, 2014, I would have stood on solid ground in denying Mr. Mateer's claim of exemption in the insurance proceeds based on his attempt to conceal their existence. *See, e.g., Matter of Yonikus*, 996 F.2d 866, 868 (7th Cir. 1993); *Doan v. Hudgins (In re Doan),* 672 F.2d 831, 833 (11th Cir. 1982); *In re Morgan*, 10-40497, 2011 WL 5025333, *7 (Bankr. D. Mass. Oct. 21, 2011); *In re St. Angelo*, 189 B.R. 24, 26 (Bankr. D.R.I. 1995). On that date, the ground shifted dramatically as a result of the decision of the Supreme Court of the United States in *Law v. Siegel*, ⸺ U.S. ⸺, 134 S. Ct. 1188 (2014).

In writing for a unanimous Court in *Siegel,* Justice Scalia articulated the question before the Court as follows: "In this case, we consider whether a bankruptcy court . . . may order that a debtor's exempt assets be used to pay administrative expenses incurred as a result of the debtor's misconduct." 134 S. Ct. at 1192. The answer given by the Court was an emphatic "no." Uncharacteristically, however, rather than conclude its decision after ruling on the question presented, the Court kept going, changing course and ending up on the subject of whether a bankruptcy court may disallow an exemption claim based on a debtor's fraudulent conduct, a

8

question not before it. The Court took note of the existing case authority disallowing an exemption based on a debtor's fraudulent concealment of the asset claimed as exempt and then observed that the Bankruptcy Code "admits no such power" to the bankruptcy court. *Id.* at 1196. The Court's declaration, while not essential to its holding, has begun to affect a sea-change among lower courts facing this issue. As the United States Court of Appeals for the First Circuit recently recognized:

> We note that the Supreme Court has recently held that bankruptcy courts do not have "a general, equitable power . . . to deny *exemptions* based on a debtor's bad-faith conduct." *See Law v. Siegel,* ––– U.S. ––––, 134 S. Ct. 1188, 1196, 188 L.Ed.2d 146 (2014) (emphasis added). In *Malley* [*v. Agin*, 693 F.3d 28 (1st Cir. 2012),] and the case it cites for the bad-faith principle, *In re Hannigan,* 409 F.3d 480 (1st Cir. 2005), we affirmed bankruptcy court orders that had relied on the debtors' bad faith to limit exemptions. *See Malley,* 693 F.3d at 30 (affirming surcharge against exempt property to offset fraudulent concealment of non-exempt property); *In re Hannigan,* 409 F.3d at 484 (affirming denial of amendment to homestead exemption as a sanction for bad faith). Although *Law* appears to overrule *Malley* and *Hannigan* to the extent they limited exemptions based on bad-faith conduct, the Supreme Court's ruling does not restrict the bankruptcy court's discretion concerning amendments unrelated to exemptions—as was the situation here.

*U.S. v. Ledee,* 772 F.3d 21, 29 n.10 (1st Cir. 2014). *See also In re Baker,* 514 B.R. 860, 863–64 (E.D. Mich. 2014) ("There is no doubt that *Siegel* curbs the power that bankruptcy courts formerly exercised under *Lucius* to disallow amendments to remedy debtors' bad faith, reckless, or dilatory conduct."), *appeal docketed,* 14–2149 (6th Cir. Sept. 5, 2014); *In re Pipkins,* No. BR 13–0087DM, 2014 WL 2756552, at *7 (Bankr. N.D. Cal. June 16, 2014) ("In *Law v. Siegel,* however, the Supreme Court held that the court cannot disallow an exemption or prevent the amendment of an exemption on equitable grounds if the exemption satisfies the statutory requisites. Therefore, the court will not disallow Debtor's exemptions [under California law], or preclude their amendment, on bad faith grounds.") (footnote omitted); *In re Franklin*, 506 B.R. 765, 771 (Bankr. C.D. Ill. 2014) ("The Court [in *Law v. Siegel*] disavowed the long-standing non-statutory basis for

9

disallowing an exemption where a debtor fraudulently conceals an exempt asset, determining that courts do not have a general equitable power to deny exemptions based on a debtor's bad faith conduct.").

The Supreme Court attempted to circumscribe the impact of its pronouncement in *Law v. Siegel* by applying it to federal exemption cases only, leaving undisturbed a bankruptcy court's power to consider a debtor's misconduct when dealing with state law exemption claims such as the homestead claim being asserted by Mr. Mateer here. This limitation is, however, far less meaningful than it sounds, at least in the First Circuit. Even if Massachusetts law recognizes a court's equitable power to deny homestead protection to a debtor engaged in fraudulent conduct with respect the homestead property[5], the United States Court of Appeals for the First Circuit in *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677 (1st Cir. 1999), has instructed that such power is pre-empted by federal law in the event bankruptcy ensues. *Weinstein* appears to slam the door left minimally open by the Supreme Court in *Law v. Siegel*.[6]

---

[5] The only reported decision addressing this issue under Massachusetts law that has come to my attention is an opinion by Justice Martha Sosman, then a superior court judge, in *Russell v. Black*, No. 992397, 2000 WL 1473468 (Mass. Super. Ct. Aug. 1, 2000). Although the court rejected the plaintiff's request that a homestead exemption should be set aside as a result of the defendant's wrongful conduct, the court acknowledged the possibility that in certain circumstances fraudulent conduct might be grounds for denying homestead protection when conduct "beyond the mere homestead declaration, indicated that the declaration was part of a pattern to defraud a particular creditor." *Id.* at *4.

[6] Could it be that *Law v. Siegel* overrules the pre-emption cases like *Weinstein* and the Supreme Court's own decision in *Owen v. Owen*, 500 U.S. 305 (1991)? In a thorough and persuasive decision dealing with an array of thorny issues involving exemptions and avoidance of judicial liens, Judge Hillman of this court rejected that notion:

> As a final note, despite the Supreme Court's recent admonition [in Law v. Siegel] that "when a debtor claims a state-created exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption," I do not understand the Supreme Court to have

More than a half century ago, Justice Robert Jackson famously observed: "We are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen,* 344 U.S. 443, 540 (1953) (concurring). Whether Justice Jackson intended to apply his quip to the Court's dicta as well as to its authoritative precedent, I do not know. The Supreme Court has issued its pronouncement that a debtor's fraudulent concealment of an asset is no obstacle to his exempting it and, dicta or not, I feel bound by it. Thus, despite his fraudulent concealment, Mr. Mateer is entitled to claim a Massachusetts homestead exemption in his home, which includes insurance proceeds, up to the automatic homestead amount of $125,000.

Mr. Ostrander offers a fallback argument as to why Mr. Mateer should not be permitted to exempt the insurance proceeds. He points to the wording of § 11(a) of the homestead statute which exempts proceeds that are "received" and argues that here the insurance proceeds were actually in the possession of PNC, as loss payee, on the petition date and thus had not been "received" by Mr. Mateer as of that date and could not be exempted. As support for his argument, Mr. Ostrander cites *In re Canto*, 476 B.R. 370 (Bankr. D. Mass. 2012), a case involving a lender's pre-petition foreclosure sale of a debtor's home, which generated a surplus after payment in full of the lender's

---

abrogated Owen's central premise that state law exemptions are preempted to the extent they conflict with the Bankruptcy Code. To the contrary, the Supreme Court cited In re Sholdan with approval as an example of how a state may provide the means to address debtor misconduct. In that case, the United States Court of Appeals for the Eighth Circuit held that under "Minnesota's enactment of the [UFTA], a debtor may not claim a homestead exemption when he or she transfers the property 'with actual intent to hinder, delay, or defraud' creditors." Thus, the restriction on the debtor's homestead arose from the Minnesota UFTA and not from an exception to the homestead statute. To be clear, however, the Massachusetts UFTA has no such provision.

*In re Dickey*, 517 B.R. 5, 22-23 (Bankr. D. Mass. 2014) (Internal footnotes omitted).

debt. As contemplated by Massachusetts law and custom in such circumstances, the lender commenced an interpleader action in state court, naming as defendants parties holding claims to some or all of the surplus, including but by no means limited to, the debtor. Before the interpleader action could be adjudicated, the debtor filed his bankruptcy petition and claimed the state homestead exemption in the surplus foreclosure sale proceeds based on the state statute under consideration here, Mass. Gen. Laws ch. 188, § 11(a).

In denying the debtor's homestead exemption claim, the court focused on the word "received" in the statute which as noted earlier states: "If a home that is subject to an estate of homestead is sold, whether voluntarily or involuntarily, taken or damaged by fire or other casualty, then the proceeds *received* on account of any such sale, taking or damage shall be entitled to the protection of this chapter. . . ." (Emphasis added). The *Canto* court concluded that the surplus foreclosure proceeds had never been received by the debtor and therefore could not be subject to the state homestead exemption. The court defined "received" as "to come into possession of."

In this case, unlike *Canto*, the evidence established that Mr. Mateer actually did receive checks totaling $115,813.69 from Chubb prior to his bankruptcy filing but since the checks were payable jointly to Mr. Mateer and PNC, Mr. Mateer sent them to PNC for endorsement. Thus on the date of Mr. Mateer's bankruptcy petition the insurance proceeds were not in his possession.

Because the facts in *Canto* are different than the facts here, the *Canto* court's ruling does not directly address the situation where a debtor receives proceeds pre-petition but relinquishes possession before he files his bankruptcy petition. Mr. Ostrander suggests that the reasoning in *Canto* compels the conclusion that proceeds received by a debtor must remain in his possession as of the petition date in order to qualify for exemption.

12

Even assuming Mr. Ostrander's interpretation of *Canto* is correct, I decline his invitation to adopt its reasoning. While I agree with the *Canto* court's definition of the word "received" in § 11(a), I respectfully disagree with the court's application of the statute. The question is not what constitutes receipt but rather receipt by whom and receipt when. *Canto* assumes without discussion that the answer to the first question is "the debtor" and Mr. Ostrander suggests the answer to the second question is "as of the bankruptcy petition date." But the statute is silent on both these critical points. If the purpose of the Massachusetts statute is to extend homestead protection beyond the home itself to sale or insurance proceeds derived from the home, then who receives the proceeds or when they are received should be of no relevance as long as the debtor ultimately has rights in those proceeds. Proceeds received by a foreclosing mortgagee, a real estate broker or for that matter a bank as insurance loss payee are all received by someone and that is all the statute requires. If the legislature intended to restrict receipt to a particular person within a specific timeframe, the statute would have said so.

Furthermore, as long as the exemption claim is properly asserted by a debtor as of the bankruptcy petition date, it should not matter when the proceeds of the exempt asset are ultimately received. Requiring both the assertion of the exemption and the receipt and retention of the proceeds as of the petition date is inconsistent with the policy, both federal and state, to construe exemption entitlements liberally in favor of debtors.[7] The federal exemptions set forth in Bankruptcy Code § 522(d), for example, offer numerous opportunities to exempt future expectancies such as the right to receive social security, veterans', disability or domestic support

---

[7] Federal exemptions are liberally construed. *Christo v. Yellin (In re Christo)*, 228 B.R. 48, 50 (B.A.P. 1st Cir. 1999). Similarly, "the State homestead exemption should be construed liberally in favor of the debtors." *Dwyer v. Cempellin*, 424 Mass. 26, 30, (1996).

13

benefits at a later date. *See* Bankruptcy Code § 522(d)(10); *see also* § 522(d)(11). For these reasons, the fact that in this case Mr. Mateer did not have personal possession of the insurance proceeds on the date he filed his bankruptcy petition is not a basis upon which to deny his right to claim an exemption in those proceeds under Mass. Gen. Laws ch. 188, § 1.

Having dispatched Mr. Ostrander's two objections to Mr. Mateer's effort to exempt the insurance proceeds, it remains only to determine what amount may be exempted. Based on the evidence presented at trial, I find that the valuation of the Douglas property presented by Mr. Mateer in the form of the appraisal of Michael Horrigan, a state-certified appraiser, and Mr. Horrigan's testimony, was more credible and accurate than the valuation evidence offered by Mr. Ostrander. Mr. Ostrander's expert, Gail Hartwell, a real estate broker not an appraiser, whose office is in Bedford, Massachusetts, some 60 miles distant from Douglas, testified to having no experience with properties in Douglas. Ms. Hartwell's written valuation was not an appraisal but a broker's price opinion which concluded with a suggested listing price for the property, not an opinion of its fair market value. Her testimony as to what the property might ultimately sell for was unpersuasive.

I, therefore, find that the value of the Douglas property on the date of Mr. Mateer's bankruptcy petition was, in accordance with Mr. Mateer's evidence, $400,000. Since the property was subject to a mortgage loan with a balance of $366,677.84, Mr. Mateer's exempt equity in the property on the petition date was $33,322.16. Based on a maximum state homestead exemption of $125,000, there remains available $91,677.84 to apply towards exempting the insurance proceeds. Accordingly, $34,384.75 of the insurance proceeds are not exempt and must be turned over to the trustee, Mr. Ostrander.

14

Mr. Mateer's amended complaint has been dismissed by agreement as to PNC. Although the amended complaint names Robert Mateer, Sr., as an "interested party," no relief is requested as to him and thus the amended complaint will be dismissed as to Robert Mateer, Sr.

Judgment consistent with this memorandum shall enter forthwith.

Dated: February 13, 2015                                By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge